ꓡ ꓩIGIN.ꓡ

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 1 8 2008

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

| | |
|---|---|
| CITY OF COLLEGE PARK and CHARLES E. PHILLIPS, SR., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| CITY OF ATLANTA, SHIRLEY FRANKLIN, in her official capacity as Mayor of the City of Atlanta, and the STATE OF GEORGIA, | ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

Civil Action File No.:

1:08-CV-1464

-JEC

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

COMES NOW, the City of College Park and Charles E. Phillips, Sr. (collectively "Plaintiffs") and file this Complaint, showing the Court as follows:

### Introduction

The City of Atlanta ("Atlanta") is using O.C.G.A. § 6-3-20, a state statute that grants it certain powers with respect to Hartsfield-Jackson Atlanta International Airport, to acquire property within College Park, clear that property of any structures or voters, and then allow it to lie fallow indefinitely. By its action, Atlanta is: (1) fundamentally altering the territorial boundaries of College

Park for electoral purposes; (2) diminishing the voting population of College Park; and (3) changing the racial composition of that voting population.

Atlanta is currently in the process of acquiring Wynterbrook Apartments, a multi-family apartment complex located in the City of College Park, from Camp Creek, LLC. With its acquisition of Wynterbrook Apartments and other multi-family complexes in College Park, Atlanta is effecting a de facto deannexation of portions of College Park and a change in the "standard, practice, or procedure with respect to voting" within College Park. Atlanta, however, has not sought preclearance for these changes as required by § 5 of the Voting Rights Act of 1965, codified at 42 U.S.C. § 1973c(a). Accordingly, Atlanta's acquisition of this property is in violation of federal law.

Accordingly, Plaintiffs seek: (1) a declaratory judgment that Atlanta must obtain preclearance as required by § 5 of the Voting Rights Act before each individual acquisition of property within College Park, including, but not limited to, the acquisition of the Wynterbrook Apartments; and (2) an injunction prohibiting Atlanta from acquiring any additional property within College Park, including, but not limited to the Wynterbrook Apartments, prior to receiving such § 5 preclearance.

## Personal Jurisdiction and Venue

1.

Plaintiff City of College Park is a Georgia municipal corporation, situated within Fulton County, and incorporated under the laws of the State of Georgia.

2.

Plaintiff Charles E. Phillips, Sr. is a citizen, voter, and council person of College Park, Georgia, domiciled in College Park's fourth ward.

3.

Defendant City of Atlanta is a municipal corporation incorporated under the laws of the State of Georgia.  It is a proper Defendant in this action for purposes of enforcement of the Voting Rights Act.  Atlanta owns and operates Hartsfield-Jackson Atlanta International Airport ("H-JAIA"), which is situated partially within the corporate limits of College Park.  Service of process against Atlanta can be pefected by serving its Mayor, Shirley Franklin, at her office, located at 55 Trinity Avenue, Atlanta, Georgia, 30303.

4.

Defendant Georgia is one of the United States.  It is a proper Defendant in this action for purposes of enforcement of the Voting Rights Act.  Service of process against Defendant State of Georgia can be perfected by serving its

Governor, George E. "Sonny" Purdue, at his office, located at 203 State Capitol, Atlanta, Georgia, 30334.

5.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## Subject Matter Jurisdiction

6.

This action arises under and is authorized by 42 U.S.C. § 1973j(f).

7.

This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3) and (4), § 2201.

8.

This Court has personal jurisdiction over Defendants.

## Background Facts

9.

The Aviation Safety and Noise Abatement Act of 1979 ("ASNA"), 49 U.S.C. §§ 47501 *et seq.* was enacted to reduce incompatible land uses in the vicinity of airports caused by aircraft noise.

10.

Under federal regulations, a day-night sound level ("DNL") of less than 65 decibels ("dB") is compatible with residential land use; a DNL between 65 and 75

is compatible with residential land use only under limited circumstances; and a DNL of more than 75 dB is incompatible with residential land use.

11.

In 1981, the Federal Aviation Administration ("FAA") established the Noise Compatibility Planning Process as a part of the Federal Aviation Regulations to implement ASNA, listed as Part 150 of Title 14 of the Code of Federal Regulations.

12.

The City of Atlanta's participation in the Part 150 program is entirely voluntary.

13.

Part 150 delineates procedures for the creation and implementation of Noise Compatibility Programs ("NCPs"), which are programs used to evaluate and recommend various operational noise abatement and land use mitigation measures that reduce noise impact and ensure land use compatibility within the airport vicinity.

14.

Under Part 150, a local airport operator such as Atlanta may submit a NCP for FAA review, which may involve any of the following noise abatement procedures: (1) land acquisition or relocation; (2) easement acquisition; (2) zoning or other land use controls; and (4) soundproofing buildings or residences.

- 5 -

15.

It is entirely within the airport operator's discretion which of the noise abatement procedures it includes in any NCP that it submits to the FAA for review. If it chooses to do so, therefore, Atlanta could eliminate land acquisition or relocation as options in its NCP, and thus limit its authority to soundproofing buildings or residences.

16.

Once a NCP is approved, the Secretary of Transportation may make grants to airport operators to carry out a project under that NCP.

17.

Under Georgia law, O.C.G.A § 6-3-20 authorizes "[c]ounties, municipalities, and other political subdivisions" to "acquire, establish, construct, expand, own, lease, control, equip, maintain, operate, regulate and police airports and landing fields . . ., either within or without the geographical limits of such counties, municipalities, and other political subdivisions, and may use for such purposes any available property that is owned or controlled by such counties, municipalities, or other political subdivisions."

18.

Because Atlanta owns H-JAIA, it may use O.C.G.A § 6-3-20 to acquire property (and relocate residents) within College Park and ASNA to secure grants for those acquisitions.

- 6 -

19.

Atlanta has been acquiring property within College Park in this manner since the 1960s.

20.

As a result, the portion of College Park owned by Atlanta has continuously increased from 7% in the 1960s to 17% in the 1970s, 27% in the 1980s, 32% in the 1990s, and 36% currently.  True and correct copies of maps depicting the portion of the City of College Park owned by Atlanta in each of these decades are attached hereto as **Exhibit A**.

21.

At the same time, College Park's population has decreased from a high of 28,203 in the 1970s to only 18,414 today.

22.

For the first forty years of such acquisitions, Atlanta acquired only single family homes in College Park.

23.

Within the last two years, however, Atlanta has accelerated the pace of its ownership of College Park by acquiring multi-family dwellings within College Park as well.

24.

To that end, Atlanta recently amended its NCP to include the acquisition of multi-family dwellings that are affected by aircraft noise.

25.

As approved, Atlanta has the discretion to acquire and demolish these dwellings or to acquire and rehabilitate such properties.

26.

Atlanta is now attempting to acquire Wynterbrook Apartments, a multi-family apartment complex located at 2600 Camp Creek Parkway, located within College Park, which has a DNL of approximately 70 dB noise exposure from the airport.

27.

Because Atlanta has agreed to accept ASNA grants for that acquisition, it is precluded from using that property for residential purposes.

28.

In addition to acquiring Wynterbrook Apartments, Atlanta also plans to acquire several other multi-family complexes along a street known as "Frontage Road," which all received the same noise exposure from the airport.

29.

The City intends to acquire Wynterbrook Apartments and the other complexes on the basis that the area's 70dB DNL qualifies the property for land

acquisition under federal and state law.

30.

As with Wynterbrook Apartments, Atlanta will be precluded from using these other apartment complexes for residential purposes.

31.

By acquiring all of these apartment complexes, Atlanta would increase its ownership of College Park to approximately 38%, and decrease the voter base of College Park's fourth ward, which currently is comprised of approximately 4,900 voters, by approximately 3,000 voters, almost all of whom are African-American.[1]

32.

On or around April 1, 2008, the Atlanta City Council approved the appropriation of $2,000,000 in City funds to match approximately $8,000,000 in federal funds granted from the FAA for the purchase of Wynterbrook Apartments.

## COUNT I

## VIOLATION OF THE VOTING RIGHTS ACT

33.

Plaintiffs incorporate Paragraphs 1 through 32 as though set forth fully herein.

---

[1] In 2000, there were 20,382 people, 7,810 households, and 4,600 families residing in the City of College Park. *See* http://censtats.census.gov/data/GA/1601317776.pdf. The racial makeup of the City was 81 81% African American, 12.39% White, 0.17% Native American, 0.61% Asian, 3.33% from other races, and 1.69% from two or more races. Hispanic or Latino of any race were 6.86% of the population.

34.

Section 5 of the Voting Rights Act requires a political jurisdiction covered by the Act to obtain either judicial or administrative preclearance before implementing any change in a "standard, practice, or procedure with respect to voting" different from that in force or effect on November 1, 1964.

35.

The State of Georgia and its political subunits, including Atlanta, are political jurisdictions covered by the Voting Rights Act.

36.

Atlanta is using O.C.G.A. § 6-3-20, a state statute that grants it certain powers with respect to Hartsfield-Jackson Atlanta International Airport, to acquire property within the geographical limits of College Park, clear that property, and then allow it to lie fallow indefinitely.

37.

Atlanta is currently in the process of acquiring Wynterbrook Apartments, a multi-family apartment complex located in the City of College Park, from Camp Creek, LLC for that very purpose.

38.

With each acquisition of property in College Park, Atlanta is fundamentally altering the territorial boundaries for electoral purposes, the voting population, and the racial composition of that population within the City of College Park.

- 10 -

39.

By its action, Atlanta is effecting a de facto deannexation of portions of College Park, reducing College Park's eligible minority voter base, and changing the "standards, practices, or procedures with respect to voting" within College Park.

40.

Because these acquisitions constitute a change in the "standards, practices, or procedures with respect to voting" within College Park, Atlanta must preclear each proposed acquisition, either by submitting it to the U.S. Attorney General for approval, or securing a declaratory judgment from the District Court for the District of Columbia, that the change does not have a racially discriminatory purpose or effect.

41.

Atlanta has not sought preclearance for these changes from the Attorney General of the United States or the United States District Court for the District of Columbia, as required by § 5 of the Voting Rights Act the Voting Rights Act.

42.

Until Atlanta receives the required preclearance, acquisition of any additional property within College Park is unlawful at this time.

43.

Plaintiffs have no adequate remedy at law to challenge the unconstitutional acquisition of College Park property, and Plaintiffs will be irreparably harmed if Atlanta acquires Wynterbrook Apartments and other property within College Park without complying with § 5 of the Voting Rights Act.

44.

If Atlanta is allowed to proceed on its current course, it will inevitably destroy the City of College Park by eliminating all of its voters.

45.

For each of these reasons, Plaintiffs are entitled to declaratory judgment that Atlanta must obtain preclearance before closing on Wynterbrook Apartments or any other property with the geographic boundaries of the City of College Park.

46.

For each of these reasons, Plaintiffs are also entitled to injunctive relief requiring Atlanta to seek preclearance before attempting to acquire additional property within the City of College Park.

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

(a)    Assume jurisdiction of this case;

(b)    Make application to the Chief Judge of the Circuit to appoint a three-

judge court to hear this case and determine whether Atlanta is required to seek preclearance under § 5 of the Voting Rights Act prior to aquiring any additional property, including but not limited to the Wynterbrook Apartments, within the City of College Park;

(c)    Enter a declaratory judgment that Atlanta must seek and obtain preclearance under the Voting Rights Act before acquiring any additional property, including but not limited to the Wynterbrook Apartments, within the City of College Park;

(d)    Enter an Order enjoining Atlanta from acquiring any additional property, including but not limited to the Wynterbrook Apartments, within the City of College Park until it seeks and obtains preclearance in accordance with § 5 the Voting Rights Act; and

(e)    All such other and further relief as the Court deems just and proper.

Respectfully submitted this 18th day of April, 2008.

Michael J. Bowers
Georgia Bar No. 071650
Greg Michell 504053
Georgia Bar No.
Robert F. Glass
Georgia Bar No. 115504

**BALCH & BINGHAM LLP**
30 Allen Plaza, Suite 700
30 Ivan Allen Jr. Blvd. N.W.
Atlanta, GA 30308
Telephone: (404) 261-6020
Facsimile: (404) 261-3656


Steven M. Fincher
Georgia Bar No. 260235
Winston A. Denmark
Georgia Bar No. 211751
L'Erin F. Barnes
Georgia Bar No. 141797

**FINCHER DENMARK &
WILLIAMS, LLC**
2262 Mount Zion Road
Jonesboro, Georgia 30236
Telephone (770) 478-9950
Facsimile (770) 471-9948


David F. Walbert
Georgia Bar No. 730450

**PARKS, CHESIN & WALBERT, P.C.**
75 14th Street, 26th Floor
Atlanta, GA 30309
Telephone: (404) 873-8000
FACSIMILE: (404)873-8050

ATTORNEYS FOR PLAINTIFFS

## VERIFICATION

Personally appeared before me, the undersigned officer duly authorized to administer oaths, *Joel P. Maine*, in his capacity as the *Mayor* of the City of College Park, who, having been first duly sworn, deposes and says that the allegations in Plaintiff's **VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** are true and correct and based upon his own personal knowledge, information and belief.

This 18th day of April, 2008.

3667 Main Street
College Park, GA 30337
City of College Park, Georgia

Sworn to and subscribed before me

this 18th day of April, 2008.

NOTARY PUBLIC

My commission expires:

June 20, 2011