IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 18 2008

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

| | |
|---|---|
| CITY OF COLLEGE PARK and CHARLES E. PHILLIPS, SR., )<br><br>Plaintiffs, )<br><br>v. )<br><br>CITY OF ATLANTA, SHIRLEY FRANKLIN, in her official capacity as Mayor of the City of Atlanta, STATE OF GEORGIA, )<br><br>Defendants. ) | Civil Action File No.<br><br>1 08-CV-1464 |

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

COMES NOW, City of College Park and Charles E. Phillips, Sr. (collectively "Plaintiffs") and file this Brief in Support of Motion for Temporary Restraining Order seeking a temporary injunction until a three-judge court can be convened[1], showing the Court as follows:

### I. STATEMENT OF FACTS

Defendant City of Atlanta ("Atlanta") has been steadily eroding the voting population of the City of College Park by acquiring property in College Park that is

---

[1] A single court judge has the authority to issue a temporary restraining order pending consideration by a three-judge court. Eastern States Petroleum Corp. v. Rogers, 265 F.2d 593, 596 (D.C. Cir 1959).

affected by aircraft noise related to Hartsfield-Jackson Atlanta International Airport. More specifically, Atlanta is using O.C.G.A. § 6-3-20, a state statute that grants it certain powers with respect to the Airport, to acquire property within the geographical limits of College Park, clear that property of structures and voters, and then allow it to lie fallow indefinitely. Although Atlanta has the discretion to rehabilitate (soundproof) such properties, it has instead chosen to systematically and continuously acquire and demolish them.

Whereas Atlanta owned approximately seven percent of College Park in the 1960s, it now owns approximately thirty-six percent of College Park. At the same time, College Park's population has decreased from a high of 28,203 in the 1970s to only 18,414 today. This acquisition of College Park property, and elimination of College Park voters, is: (1) fundamentally altering the territorial boundaries of College Park for electoral purposes; (2) diminishing the voting population of College Park; and (3) changing the racial composition of that voting population.

Within the last two years, Atlanta has accelerated the pace of its acquisition of College Park property, and elimination of College Park voters, by acquiring multi-family dwellings within College Park. Atlanta is currently in the process of acquiring Wynterbrook Apartments, a several hundred unit multi-family housing complex in College Park, along with other similar housing complexes along "Frontage Road" in College Park.

With its acquisition of Wynterbrook Apartments and other multi-family complexes in College Park, Atlanta will irreparably harm College Park by effecting a de facto deannexation of portions of College Park and changing a "standard, practice, or procedure with respect to voting" within College Park. Atlanta, however, has not sought preclearance for this change as required by § 5 of the Voting Rights Act of 1965, codified at 42 U.S.C. § 1973c(a). Accordingly, Atlanta's acquisition of this property is in violation of federal law.

Concurrently with this Motion, Plaintiffs have filed their Verified Complaint for Declaratory Judgment and Injunctive Relief against the City of Atlanta and the State of Georgia, asking the Court to: (1) convene a three-judge court to hear this case and determine whether Atlanta is required to seek preclearance under § 5 of the Voting Rights Act prior to acquiring the Wynterbrook Apartments; (2) declare that Atlanta must seek and obtain preclearance under the Voting Rights Act before acquiring Wynterbrook Apartments; and (3) enjoin Atlanta from acquiring the Wynterbrook Apartments, or any other property within the City of College Park until it obtains such preclearance.

In the interim, Plaintiffs respectfully request the Court enter a temporary restraining order enjoining Atlanta from acquiring the Wynterbrook Apartments, or any other property within the City of College Park, until either such acquisition is

precleared in accordance with § 5 or the three-judge court determines that such preclearance is not required.

## II. ARGUMENT AND CITATION TO AUTHORITY

The standard for obtaining a temporary restraining order ("TRO") in the Eleventh Circuit is the same as that for obtaining a preliminary injunction. See Parker v. State Bd. of Pardons and Paroles, 275 F.3d 1032, 1034-35 (11th Cir. 2001). "A TRO or preliminary injunction is appropriate where the movant demonstrates that: (a) there is a substantial likelihood of success on the merits; (b) the TRO or preliminary injunction is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant; and (d) the TRO or preliminary injunction would not be adverse to the public interest." Id. (citing Zardui-Quintana v. Richard, 768 F.2d 1213, 1216 (11th Cir. 1985)).

The decision to grant or deny injunctive relief is within the sound discretion of the trial court. See Cafe 207, Inc. v. St. Johns County, 989 F.2d 1136, 1137 (11th Cir. 1993). However, a district court "must exercise its discretion in light of the four prerequisites." Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994). Accordingly, Plaintiffs simply must demonstrate to the Court that each of the four requirements is met so that the Court may issue a TRO. This Court

should grant Plaintiffs' Motion because all four of the required elements are satisfied. Each of these is addressed in more detail below.

### A. Plaintiffs Have a Substantial Likelihood of Success on the Merits

Plaintiffs are substantially likely to succeed on the merits of the case because there is little question that Atlanta has violated Plaintiffs' rights under the § 5 of the Voting Rights Act of 1965, codified at 42 U.S.C. § 1973c(a). Section 5 of the Voting Rights Act requires a political jurisdiction covered by the Act—such as Atlanta, as a political subunit of Georgia—to obtain either judicial or administrative preclearance before implementing changes in a "standard, practice, or procedure with respect to voting" different from that in force or effect on November 1, 1964. See Georgia v. Ashcroft, 539 U.S. 461, 461 (2003) (confirming that Georgia is a covered jurisdiction under § 5). In addition, the United States Supreme Court has held that "[c]hanging boundary lines by annexations which enlarge the city's number of eligible voters also constitutes a change of a 'standard, practice, or procedure with respect to voting.'" Perkins v. Matthews, 400 U.S. 379, 388 (1971).

Here, through its purchase Wynterbrook Apartments and the other complexes, Atlanta will continue to alter the minority voting population and racial composition of College Park. These boundary changes are unquestionably changes in a standard, practice, or procedure with respect to voting rights. Nonetheless,

Atlanta has not filed preclearance for these changes are required by 42 U.S.C. § 1973c(a). Accordingly, Atlanta is operating in violation of federal law, and should be temporarily restrained from closing on Wynterbrook Apartments and any other College Park property until it obtains the requisite preclearance or the three-judge court determines that such preclearance is not required.

### B. An Injunction is Necessary to Prevent Plaintiffs from Suffering Irreparable Injury

Without restraining Atlanta's acquisition of Wynterbrook Apartments and the other complexes, Plaintiffs will be irreparably injured. Once the property is sold, the land is cleared and the voters relocated. In the short run, if these transactions are completed, Atlanta will increase its ownership of College Park to approximately thirty-eight percent, and decrease the voter base of College Park's fourth ward, which currently is comprised of approximately 4,900 voters, by approximately 3,000 voters, almost all of whom are African-American. In the long run, if Atlanta is allowed to continue its campaign unabated, it will eliminate the voters the voters of College Park and destroy the city.

Also, if this Court does not enter an injunction, Plaintiffs will be denied their rights under 42 U.S.C. § 1973c(a), which is irreparable harm itself. "As to irreparable harm, it is well-settled that the claimed deprivation of a constitutional right such as the right to a meaningful vote or to the full and effective participation in the political process is in and of itself irreparable harm." Puerto Rican Legal

Defense and Educ. Fund, Inc. v. City of New York, 769 F. Supp. 74, 79 (E.D.N.Y. 1991) (citing Reynolds v. Sims, 377 U.S. 533, 562, 565 (1964)). Atlanta's acquisition of Wynterbrook and the other complexes will essentially wipe out one of College Park's four wards, substantially diminishing the minority voting population and eliminating significant minority voting opportunities.

**C.  The Injury Plaintiffs Will Suffer from Atlanta's Acquisition of Wynterbrook Outweighs any Harm that the Injunction Would Cause Atlanta**

The injury Plaintiffs will suffer from Atlanta's acquisition of Wynterbrook or any other College Park property outweighs any potential harm Atlanta would suffer from an injunction delaying or preventing the acquisition. College Park will suffer by Atlanta depriving College Park's citizens of their rights under the Voting Rights Act as well as losing voters and its property. Atlanta, by contrast, will suffer only by being required to comply with federal law before attempting to acquire Wynterbrook and or any other College Park property which falls under 42 U.S.C. § 1973c(a). Further, because Atlanta is prohibited by the terms of the federal grant used for this acquisition, it can not use the property for residential purposes. Therefore, it will suffer no injury as a result of this injunction.

**D.  An Injunction Would Not be Adverse to the Public Interest**

There is no evidence to suggest that this Court's granting of Plaintiffs' Motion would harm the public interest. If anything, halting the attempted

acquisition of Wynterbrook until Atlanta complies with federal law would benefit the public interest, especially the 3,000 minority citizens who comprise much of College Park's fourth ward and need this Court's intervention.

### III. <u>CONCLUSION</u>

For all these reasons, Plaintiffs respectfully request this Court grant its Motion for Temporary Restraining Order and enter an Order preventing Atlanta from acquiring Wynterbrook Apartments or any other College Park property without obtaining preclearance under 42 U.S.C. § 1973c(a) or the three-judge court determines that such preclearance is not required.

Respectfully submitted this 18th day of April, 2008.

*/s/ Michael J. Bowers*
Michael J. Bowers
Georgia Bar No. 071650
Greg Michell
Georgia Bar No. 504053
Robert F. Glass
Georgia Bar No. 115504

**BALCH & BINGHAM LLP**
30 Allen Plaza, Suite 700
30 Ivan Allen Jr. Blvd. N.W.
Atlanta, GA 30308
Telephone: (404) 261-6020
Facsimile: (404) 261-3656

Steven M. Fincher
Georgia Bar No. 260235
Winston A. Denmark
Georgia Bar No. 211751
L'Erin F. Barnes
Georgia Bar No. 141797

**FINCHER DENMARK & WILLIAMS, LLC**
2262 Mount Zion Road
Jonesboro, Georgia 30236
Telephone (770) 478-9950
Facsimile (770) 471-9948

**PARKS, CHESIN & WALBERT, P.C.**
75 14th Street, 26th Floor
Atlanta, GA 30309
Telephone: (404) 873-8000
FACSIMILE: (404)873-8050

David F. Walbert
Georgia Bar No. 730450

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** has been served upon the following by hand delivery on this the 18th day of April, 2008.

>City of Atlanta
>c/o Mayor Shirley Franklin
>55 Trinity Avenue
>Atlanta, Georgia, 30303
>
>State of Georgia
>c/o Governor Sonny Perdue
>203 State Capitol
>Atlanta, Georgia, 30334
>
>Robert Caput
>Michael S. Fineman
>City of Atlanta Department of Law
>East End, Suite 300
>Hartsfield-Jackson Atlanta International Airport
>6000 N. Terminal Parkway
>Atlanta, Georgia 30320

_____
Greg Michell
Georgia Bar No. 504053

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1(C)

I hereby certify that the foregoing Brief in Support of Motion Temporary Restraining Order has been prepared in a Times New Roman 14 point font, one of the font and point selections approved by the Court in Local Rule 5.1(C).

/s/ Greg Michell
Greg Michell
Georgia Bar No. 504053