IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CHAMBERS
U.S.D.C. Atlanta

MAR 3 1 2009

JAMES N. HATTEN, Clerk
By _____
Deputy Clerk

CITY OF COLLEGE PARK and
CHARLES E. PHILLIPS, SR.,

        Plaintiffs,

v.

CITY OF ATLANTA and SHIRLEY
FRANKLIN, in her official
capacity as Mayor of the City
of Atlanta,

        Defendants.

CIVIL ACTION
NO. 1:08-CV-1464

## ORDER AND OPINION

This case is presently before the Court on plaintiffs' Request for Three-Judge Court [4] and plaintiffs' Motion for Leave to File First Amended Complaint [40].  The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that plaintiffs' Request for Three-Judge Court [4] should be **DENIED** and plaintiffs' Motion for Leave to File First Amended Complaint [40] should be **DENIED**.

## BACKGROUND

This lawsuit seeks a declaratory judgment that defendant Atlanta's lawful acquisition of property near the Hartsfield-Jackson Atlanta International Airport ("Airport"), and within College Park's

city limits, implicates the Voting Rights Act of 1965[1] and, as a
result, all such acquisitions must be precleared by the Department of
Justice or United States District Court for the District of Columbia,
pursuant to Section 5 of that Act.  Because Atlanta did not preclear
its recent purchase of an apartment complex in College Park,
plaintiffs contend that this purchase must be undone until the
Department completes the necessary preclearance procedures.  As any
non-frivolous claim alleging a failure to comply with Section 5 must
be heard by a three-judge panel, plaintiff has requested that this
Court convene such a panel so that the latter may resolve the merits
of plaintiffs' ultimate claim seeking a requirement of preclearance
on any future purchases.

Plaintiffs in this case are the City of College Park, which is
a municipal corporation in Fulton County, Georgia, and Charles E.
Phillips, Sr., "a citizen, voter, and council person of College
Park."  (Compl. [1] at ¶¶ 1-2.)  Defendants are the City of Atlanta,
Georgia and Shirley Franklin in her official capacity as the Mayor of
Atlanta.[2]  (*Id.* at ¶ 3.)

Since the 1960s, Atlanta has lawfully acquired property in

---

[1]   42 U.S.C. § 1973c.

[2]   Plaintiffs also named the State of Georgia as a defendant,
*id.* at ¶ 4, but the Court dismissed the State of Georgia as a
defendant on May 30, 2008.  (*See* May 30, 2008 Consent Order [26] at
1.)

AO 72A
(Rev.8/82)

College Park in connection with the expansion of the Airport and in accordance with a state statute permitting Atlanta to own property outside its jurisdictional limits for the purpose of operating the Airport.[3]  Since 1979, Atlanta has also been allowed to acquire land in conjunction with a federal noise abatement program authorized by the Aviation Safety and Noise Abatement Act of 1979 ("ASNA"), 49 U.S.C. § 47501 *et seq.* The ASNA permits cities to reduce incompatible land uses in the vicinity of airports where airplane noise has rendered the land less desirable for residential use.

In April 2008, Atlanta purchased an apartment complex within the municipal boundaries of College Park--Wynterbrook Apartments ("Wynterbrook")--as part of this federally approved noise abatement program.  (*See* Compl. [1] at ¶ 26; Hr'g Tr. [8] at 3.)  As a result, the tenants in Wynterbrook, who are almost all African-American, were required to move.  (*See* Compl. [1] at ¶ 31; Pls.' Supplemental Br. [23] at 10-11.)

---

[3]   *See* GA. CODE ANN. § 6-3-20 (1933):

> Counties, municipalities, and other political subdivisions are authorized, separately or jointly, to acquire, establish, construct, expand, own, lease, control, equip, improve, maintain, operate, regulate, and police airports and landing fields for the use of aircraft, either within or without the geographical limits of such counties, municipalities, or other political subdivisions, and may use for such purpose or purposes any available property that is owned or controlled by such counties, municipalities, or other political subdivisions.

3

Plaintiffs filed a Complaint [1] on April 18, 2008, seeking a declaration that defendants must obtain administrative or judicial preclearance, as required by Section 5 of the Voting Rights Act, to acquire property within College Park.   (See Compl. [1] at 2.) Plaintiffs allege that defendants are in violation of Section 5 of the Voting Rights Act because their acquisitions of land are "(1) fundamentally altering the boundaries of College Park for electoral purposes; (2) diminishing the voting population of College Park; and (3) changing the racial composition of that voting population." (Id. at 1-2.)

Plaintiffs also sought an injunction prohibiting defendants from acquiring Wynterbrook and any additional property within College Park until a three-judge panel could be convened.   (Mot. for TRO [3] at 1.)   The Court granted plaintiffs' Motion for Temporary Restraining Order (Apr. 18, 2008 Order [5] at 1-2) and enjoined defendants from acquiring Wynterbrook and any other property within the City of College Park until the issue of injunctive relief was briefed and resolved.   Because the acquisition of Wynterbrook by Atlanta had already been finalized by the time the Order [5] had been issued, the Court later that same day vacated, as moot, that part of its Order [5] referring to Wynterbrook. (See Apr. 18, 2008 Order [6] at 1-2.)

At a status conference on April 21, 2008, the Court directed plaintiffs to submit an additional filing to explain further the

4

claims and relief they sought.  (*See* Hr'g Tr. [8] at 48.)  Plaintiffs
filed their Supplemental Brief [23] and, on September 4, 2008,
plaintiffs filed a Motion for Leave to File First Amended Complaint
[40].  Plaintiffs' request for a three-judge panel and motion to
amend complaint have now been fully briefed.

## DISCUSSION

### I.  Request for Three-Judge Court

####    A.    Standard for Three-Judge Court

Plaintiffs allege that defendants violated Section 5 of the
Voting Rights Act.  The Voting Rights Act provides that:

> [no] voting qualification or prerequisite to voting, or
> standard, practice, or procedure with respect to voting
> different from that in force or effect on November 1, 1964,
> . . . [can] ha[ve] the purpose []or will have the effect of
> denying or abridging the right to vote on account of race
> or color . . . .

42 U.S.C.A. § 1973c(a).

To comply with this provision, Section 5 of the Voting Rights
Act requires covered jurisdictions to obtain preclearance from the
Attorney General of the United States or the United States District
Court for the District of Columbia before enacting any such "voting
qualification or prerequisite to voting, or standard, practice, or
procedure with respect to voting."  *Id.*  Georgia is a "covered
jurisdiction" subject to the pre-clearance requirements of 42
U.S.C.A. § 1973c.  *See Georgia v. Ashcroft*, 539 U.S. 461, 466 (2003);

5

*City of Rome v. United States*, 446 U.S. 156, 161 (1980).

Section 5 of the Voting Rights Act mandates that any action for a violation of Section 5 "shall be heard and determined by a court of three judges." 42 U.S.C.A. § 1973c(a). Although single district judges cannot determine the merits of claims alleging a failure to comply with the provision of Section 5, if a plaintiff's challenge is "wholly insubstantial or completely without merit," a district judge may determine that a three-judge panel is not required. *United States v. Saint Landry Parish Sch. Bd.*, 601 F.2d 859, 863 (5th Cir. 1979) (citations omitted).[4]

A Court must be cautious in referring a claim to a three-judge panel: "Individuals must not be allowed to obtain a three-judge court, with its concomitant burdens, simply by intoning the catchwords of [Section] 5. [A] court has an obligation to examine the complaint to determine whether it states a substantial claim." *Miller v. Daniels*, 509 F. Supp. 400, 405 (S.D.N.Y. 1981).

Plaintiffs filed a Request for Three-Judge Court [4] so that the latter could determine whether Atlanta's acquisition of property from College Park requires preclearance under Section 5 of the Voting Rights Act. The Court rejects plaintiffs' request, which it

---

[4] Decisions of the former Fifth Circuit filed prior to October 1, 1981 constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

AO 72A
(Rev.8/82)

construes as a motion, because (1) plaintiffs do not meet the
requirements for declaratory relief and (2) plaintiffs' allegations
do not give rise to claims under Section 5 of the Voting Rights Act.

**B.   Plaintiffs' Claims Do Not Warrant a Three-Judge Court
Because They Do Not Meet the Requirements for Declaratory
Relief.**

The sole issue before this Court is whether the case should be
certified to a three-judge panel to determine whether Atlanta's
acquisition of property from College Park in the future will require
preclearance under Section 5 of the Voting Rights Act.

Plaintiffs' Complaint [1] states that plaintiffs desire a
declaratory judgment "that Atlanta must seek and obtain preclearance
under the Voting Rights Act before acquiring any additional property,
including but not limited to the Wynterbrook Apartments, within the
City of Atlanta." (Compl. [1] at 13.)[5]   To issue a declaratory
judgment, a court must determine "whether the facts alleged, under
all the circumstances, show that there is a substantial controversy,
between parties having adverse legal interests, of sufficient
immediacy and reality to warrant the issuance of a declaratory

---

[5]   The original Complaint [1] does not request a declaratory
judgment regarding preclearance for all prior transactions, but
plaintiffs have sought to amend their Complaint to address all prior
purchases since 1965, arguing that this issue should "be treated in
all respects as if [it had been] raised in the pleadings" because it
was tried by "express or implied consent" of the parties.   FED. R.
CIV. P. 15(b).   (*See* Pls.' Mot. for Leave to File First Am. Compl.
[40] at 6.)

7

AO 72A
(Rev.8/82)

judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (internal quotation marks and citation omitted).

The Court concludes that the possibility that Atlanta may acquire property in College Park in the future is not a "substantial controversy" of "sufficient immediacy and reality." *Id.* Though plaintiffs reference documents that discuss potential future acquisitions,[6] plaintiffs can point to no specific plans by Atlanta to make new purchases. Moreover, plaintiffs' allegation that "[d]efendants have admitted that they have firm plans to acquire additional multi-family properties in College Park" is not accurate. (Reply in Supp. of Pls.' Supplemental Br. [33] at 3.) In fact, plaintiffs implicitly recognize that the previous statement is untrue when they state that "no further injunctive relief is necessary at this point" because "no further acquisitions in College Park are currently in progress."[7] (Pls.' Supplemental Br. [23] at 32-33.) In addition, defendants stated at the April 21, 2008 status conference

---

[6] (*See, e.g.,* Pls.' Supplemental Br. [23], Ex. F (e-mail discussing potential properties to purchase); Ex. G (Atlanta Airport Anticipated Noise Mitigation Funding Needs for 2005 & 2006, which plaintiffs state is relevant "due to delays in implementation," (Pls.' Supplemental Br. [23] at 11 n.10), even though it is dated several years ago); Ex. H (Atlanta Airport's FAR Part 150 Study, Noise Compatibility Program Report, Volume II, which states that 876 residences are located in areas with excessive noise).)

[7] Plaintiffs also acknowledged that the hypothetical plan has not been "implemented." (Reply in Supp. of Pls.' Supplemental Br. [33] at 18.)

8

that they did not have any definite plans to acquire any additional property.[8]

In short, the possibility that Atlanta might purchase unspecified properties at unspecified dates in the future does not create a controversy between the parties of such "immediacy" that the Court should convene a three-judge court. *MedImmune, Inc.*, 549 U.S. at 127 (citation omitted). Because plaintiffs are not entitled to any declaratory relief, the issue of a three-judge court is therefore moot.

**C.   Even If Plaintiffs Met the Requirements for Declaratory Relief, Plaintiffs' Allegations Do Not Give Rise to Claims Under Section 5 of the Voting Rights Act.**

**1.   The Scope of Section 5 of the Voting Rights Act Is Not Unlimited.**

Although Section 5's scope is "broad[],"[9] the Supreme Court has warned that Congress did not "mean[] to subject all or even most decisions of government in covered jurisdictions to federal

---

[8]   Defendants' counsel stated that "the City of Atlanta has had no conversations with property owners" and "has engaged in no dialogue whatsoever with the owners of the other apartment complexes." (Hr'g Tr. [8] at 37.) Counsel also stated that "there is no real likelihood that the city will purchase these properties at any point in the near future," (*id.* at 38), and noted that any acquisition takes "many, many years" and requires "a tremendous amount of consideration and due diligence." (*Id.*)

[9]   *Morse v. Republican Party of Va.*, 517 U.S. 186, 204 (1996) (quoting *Allen v. State Bd. of Elections*, 393 U.S. 544, 567 (1969) (internal quotation marks omitted)).

supervision." *Presley v. Etowah County Comm'n*, 502 U.S. 491, 504 (1992). Section 5 only applies if the action complained of is a "voting qualification or pre-requisite to voting, or standard, practice, or procedure with respect to voting." *Saint Landry Parish Sch. Bd.*, 601 F.2d at 864 n.7 (quoting 42 U.S.C.A. § 1973c) (internal quotation marks omitted). "Some standard is necessary" for "distinguishing between changes in rules governing voting and changes in the routine organization and functioning of government" because "in a real sense[,] every decision taken by [a] government implicates voting." *Presley*, 502 U.S. at 504. Therefore, a challenged action must "bear a direct relation to voting," *id.* at 510, and courts must draw lines "between those governmental decisions that involve voting and those that do not." *Id.* at 504.

### 2. Section 5 of the Voting Rights Act Does Not Apply to a Purchase of Land.

Despite plaintiffs' claims, Atlanta's purchase of property within the boundaries of College Park does not "bear a direct relation to voting." *Id.* at 510. Therefore, Section 5 of the Voting Rights Act cannot apply in this case.

The Supreme Court has recognized four scenarios that can give rise to Section 5 claims. *Presley*, 502 U.S. at 492. Three of the scenarios obviously do not apply here: that is, changes in the "manner of voting," changes in "candidacy residency requirements and

10

qualifications," and changes that "abol[ish] or creat[e] an elective office." *Id.* Atlanta's purchase of land within College Park's boundaries does not change the manner of voting in College Park, as Georgia law provides that College Park controls that matter, regardless of the owner of the property within its borders.[10] Further, plaintiffs have not alleged that Atlanta has control over candidacy qualifications within the municipal boundaries of College Park or that Atlanta has created or abolished any elective office in College Park.

It is the final scenario--a change that affects "the composition of the electorate that may vote for candidates for a given office"[11]--on which plaintiffs peg their argument. The Court disagrees.

First, Atlanta has not altered municipal boundaries. Plaintiffs allege, however, that by acquiring property, defendants are "fundamentally altering the territorial boundaries for electoral purposes" in contravention of 28 C.F.R. § 51.13(e), which states that "[c]hanges affecting voting include, but are not limited to, the following examples: . . . [a]ny change in the constituency of an

---

[10]    *See, e.g.,* GA. CODE ANN. § 21-2-260(b) ("[t]he governing authority of each municipality shall determine and establish the number and boundaries of municipal voting precincts"); GA. CODE ANN. § 21-2-70.1(a) (providing that the "municipal superintendent shall conduct . . . all municipal elections held within his or her municipality").

[11]    *Presley*, 502 U.S. at 492.

11

official or the boundaries of a voting unit (e.g., through redistricting, annexation, de[-]annexation, incorporation, reapportionment, changing to at-large elections from district elections, or changing to district elections from at-large elections)." (See Compl. [1] at 1; Pls.' Supplemental Br. [23] at 23.) Thus, plaintiffs contend that Atlanta's purchase of property in College Park constitutes a "de facto de[-]annexation" that results in the change of the boundaries of a voting unit. (See Compl. [1] at ¶ 39.)

Though plaintiffs may feel that Atlanta's purchase of property within their boundaries constitutes a de-annexation, as a practical matter, annexation and de-annexation are formal matters not subject to the vagaries of subjective opinion. An annexation is "[a] formal act by which a nation, state, or municipality incorporates land within its dominion." BLACK'S LAW DICTIONARY 98 (8th ed. 2004.) Likewise, a de-annexation would be a "formal act by which a nation, state, or municipality" unincorporates "land within its dominion." Id. Georgia law provides that "[n]o municipal corporation shall . . . have its boundaries changed except by local Act of the General Assembly or by such methods as may be provided by general law." GA. CODE ANN. § 36-35-2(a).

As a matter of law, then, a boundary of a municipality cannot be changed in Georgia absent an Act of the legislature effecting that

12

change.    Clearly, Atlanta has no power to annex or alter the
boundaries of another jurisdiction.    Both state and federal law
sanction Atlanta's past purchases of property near the airport.
While such purchases in the future may change somewhat the makeup of
property owners in College Park, they do not contract College Park's
territorial boundaries so as to result in a de-annexation.

Moreover, to prevail on a claim that College Park property has
been de-annexed, plaintiffs must allege that College Park's municipal
boundaries in existence on November 1, 1964 were altered.    *See*
*Presley*, 502 U.S. at 495 (Section 5 of the Voting Rights Act
"requires [courts] to use practices in existence on November 1, 1964,
as [the] standard of comparison.")  Plaintiffs do not and cannot make
such a claim, however, as the boundaries of College Park have not
changed since the 1960s.  (*See* Pls.' Supplemental Br. [23], at Ex.
B.)

Further, Atlanta does not have jurisdiction over College Park.
The annexation and de-annexation cases cited by plaintiffs involved
actions against the political subdivision that had authority to
impose rules governing voting on the residents in the annexed or de-
annexed property.  *See generally City of Pleasant Grove v. United
States*, 479 U.S. 462 (1987), *City of Rome*, 446 U.S. at 156.  Atlanta
has no authority concerning voting practices in the purchased
property or in any other section of College Park.

13

Plaintiffs cite no case, nor has the Court found one, in which an entity's purchase of property in a separate governmental voting jurisdiction violated Section 5 of the Voting Rights Act. The Court has also found no case in which a plaintiff successfully sued a jurisdiction that had no power over the electoral process, either before or after the change in question.[12] The Supreme Court has said that "[t]he language, structure, history, and purposes of the [Voting Rights] Act persuade [the court] that [Section] 5, like the constitutional provisions it is designed to implement, applies to all entities having power over any aspect of the electoral process within designated jurisdictions." *United States v. Bd. of Comm'rs of Sheffield, Ala.*, 435 U.S. 110, 118 (1978). Again, Atlanta has no jurisdiction to enact or impose rules and regulations upon the

---

[12]   The one case that plaintiffs cite for this proposition, *Robinson v. Ala. State Dep't of Educ.*, 652 F. Supp. 484 (M.D. Ala. 1987), is distinguishable. In *Robinson*, the public schools located within a city had previously been part of the county school system and were governed by an elected county board of education. The city pulled those schools within its jurisdiction from county control and created an appointed city board of education. *Id.* at 485. The county's population was 65% black; the city's was 52% white. *Id.*

Plaintiff county residents sued the city. *Id.* The three-judge panel concluded that this was a change requiring preclearance as the resolution permitting the school grab by the city changed both the means by which the board members were selected and changed the constituency that selected those members. In *Robinson*, then, the plaintiffs were challenging an entity that had control over the election process concerning the school system. Here, again, Atlanta controls nothing in College Park.

AO 72A
(Rev.8/82)

citizens of College Park concerning "any aspect of the electoral process." *Id.*

Plaintiffs are attempting to shoehorn their inapt facts into a Voting Rights case. In order to rule that Atlanta be required to pre-clear its noise abatement purchases of property, this Court would have to make a huge leap that would expand the kind of action covered by Section 5 beyond that previously recognized by any other court. If the Court determined that a referral to a three-judge panel were necessary, a limitless number of factual scenarios that were not contemplated by the statute would be referred to three-judge panels. Such a result would greatly burden the federal court system, as well as local governments, whose decision-making would be subject to increased micromanagement by the federal government.

Additionally, plaintiffs' Section Five claim seems pretextual, as their real grievances have nothing to do with voting rights. When the court directed the plaintiffs to list the negative effects of Atlanta's acquisition of property in College Park, only three of plaintiffs' seven reasons even tangentially related to voting.[13] Plaintiffs point primarily to the loss of taxes, loss of utility payments, loss of contractual and business relationships, and loss of

---

[13] Plaintiffs referred to "enormous political dislocation[s]" of "virtually the entire population of Ward 4" and of "22% of College Park's entire population" as well as the "[t]hreatened viability of College Park as a political entity." (Pls.' Supplemental Br. [23] at 14.)

property value as reasons that they object to Atlanta's noise abatement purchases. (Pls.' Supplemental Br. [23] at 14.) While those impacts understandably concern plaintiffs, they do not implicate the Voting Rights Act. As defendants explain, the Voting Rights Act "is not designed as a statute to provide remedies for purported adverse financial effects, property value impacts, contractual and business relationships, losses and disruptions to municipal governance, political dislocations or political entity viability." (Defs.' Opp'n to Pls.' Supplemental Br. [29] at 10.)[14]

Therefore, the Court concludes that plaintiffs' claims are "wholly insubstantial" and "completely without merit" and therefore do not warrant a three-judge panel. *Saint Landry Parish Sch. Bd.*, 601 F.2d at 863.

---

[14]   Plaintiffs make the additional point that, under the applicable aviation statute (ASNA), Atlanta has the option to soundproof buildings rather than raze them, and therefore Atlanta is wrong not to have implemented that option first. (*See, e.g.*, Pls.' Supplemental Br. [23] at 3-4.) However, nowhere does the aviation statute require an entity to consider a soundproofing option before razing. Likewise, plaintiffs' argument that Atlanta should acquire single-family homes rather than multiple-family homes is also beside the point. Nowhere does the statute require plaintiffs to take over only single-family homes. (*Id.* at 6.) Plaintiffs further note that many residents never complained about the noise, which is also not pertinent. (*Id.* at 8.)

Beyond the above details, these arguments are irrelevant because plaintiffs have not brought an action challenging the application of the ASNA. They have brought claims under the Voting Rights Act. None of the above quibbles implicate the Voting Rights Act.

AO 72A
(Rev.8/82)

**II.   Motion for Leave to File First Amended Complaint**

**A.   Standard for Filing Leave to Amend**

Plaintiffs also filed a Motion to File First Amended Complaint [40] to add claims concerning past purchases.  The Federal Rules of Civil Procedure provide:

> A party may amend its pleading once as a matter of course [] before being served with a responsive pleading . . . . In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

FED. R. CIV. P. 15(a)(1)(A); 15(a)(2).  Thus, "[i]n the absence of any apparent or declared reason . . . the leave sought should, as the rules require, be 'freely given.'"  *McKinley v. Kaplan*, 177 F.3d 1253, 1258 (11th Cir. 1999) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962) (internal quotation marks omitted)).  A court must have a "justifying" reason for a court to deny leave to amend.  *Foman*, 371 U.S. at 182.

**B.   Plaintiffs' Amended Complaint Would Be Futile.**

The Court has a "justifying" reason to deny plaintiffs' leave to amend.  *Id.*  A court "may properly deny leave to amend [a] complaint under Rule 15(a) when such amendment would be futile."  *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004) (citing *Foman*, 371 U.S. at 182).  A court's "denial of leave to amend is justified by futility when the complaint as amended is still subject

17

AO 72A
(Rev.8/82)

to dismissal." *Hall*, 367 F.3d at 1263 (quoting *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999)) (internal quotation marks omitted).

In addition to seeking injunctive relief as to future purchases, the proposed Amended Complaint [40-2] seeks to add a claim for all of Atlanta's purchases of land that have occurred over the last forty years. As the Court has already determined that Section 5 of the Voting Rights Act does not apply to such transactions, the Amended Complaint [40-2] would be futile.[15] Therefore, the Court **DENIES** plaintiffs' Motion for Leave to File First Amended Complaint [40].

### CONCLUSION

The Court understands the frustrations that Atlanta's purchases of College Park land over the years have created for College Park and

---

[15] Further, even if Section 5 of the Voting Rights Act permitted a court to undo old land purchases, how would one go about rescinding purchases of land that have occurred over the last 40 years, particularly when neither the seller nor purchaser want to undo the transaction? Would College Park be permitted to purchase the property from Atlanta? What would be the price at which College Park would purchase the property? As Atlanta was able to purchase the property only through the Aviation Safety and Noise Abatement Act, by what authority would ownership default to College Park? As that Act requires that the purchased property no longer be used for residential purposes, it would seem that College Park would also have to abide by that condition, meaning that the purchased properties would continue unoccupied even if College Park owned them. If that is so, how has College Park helped itself through this litigation?

its city fathers, and the Court sympathizes.  Yet, to the extent that plaintiffs quarrel with the broad confiscatory power that the Aviation Safety and Noise Abatement Act confers on a potentially rapacious municipality operating an airport in a city outside its own borders, that quarrel must be waged before the Congress in an effort to have this law changed.  Unfortunately for plaintiffs, Section 5 of the Voting Rights Act provides no solace.

For the foregoing reasons, the Court **DENIES** plaintiffs' Request for Three-Judge Court [4] and Motion for Leave to File First Amended Complaint [40].  The Court also **VACATES** its previous injunction [5]. The **Clerk** is directed to close this action.

SO ORDERED, this _31_ day of March, 2009.

_____
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)