IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CITY OF COLLEGE PARK and<br>CHARLES E. PHILLIPS, SR.,<br><br>    Plaintiffs,<br><br>v.<br><br>CITY OF ATLANTA and SHIRLEY<br>FRANKLIN, in her official capacity as<br>Mayor of the City of Atlanta,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION NO.<br>)  1:08-CV-1464-JEC<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION TO RESTORE INJUNCTION PENDING APPEAL**

Pursuant to Federal Rule of Civil Procedure 62(C), Plaintiffs City of College Park and Charles E. Phillips, Sr. file this, their Brief in Support of Motion to Restore Injunction Pending Appeal, showing the Court as follows:

**I.   INTRODUCTION**

By Order dated March 31, 2009, this Court denied Plaintiffs' Request for Three-Judge Court and vacated its previous injunction, which temporarily prohibited the City of Atlanta from demolishing the buildings at the Wynterbrook property and from acquiring additional properties in College Park, Georgia as part of the airport's nose abatement program.  See Order, p. 19.  Plaintiffs have filed a

Notice of Appeal of that Order, and hereby respectfully request that the Court restore its prior injunction pending final determination of Plaintiffs' appeal.

A party seeking restoration of an injunction pending appeal must show (1) that he will likely prevail on the merits of the appeal, (2) that he will suffer irreparable injury if the restoration is denied, (3) that other parties will not be harmed by the restoration, and (4) that the public interest will be served by granting the restoration. See Section III below. The Court should grant Plaintiffs' Motion for the following reasons:

(1) given the difficult and novel issue presented when a city subject to Section 5 exercises extraterritorial powers to displace minority voters in an adjacent city, the minimal showing necessary to require certification of a Section 5 claim to a three-judge court, and the fact that three of the four prongs above weigh heavily in their favor, caselaw is clear that Plaintiffs satisfy the first prong required to restore an injunction;

(2) if Defendants demolish Wynterbrook while Plaintiffs' appeal is pending, it will result in irreparable harm to Plaintiffs as it will render Plaintiffs' remedy on appeal meaningless;

(3) the City of Atlanta has no immediate plans to do anything with the property other than to demolish it and, therefore, will not be prejudiced by the restoration of the injunction while the appeal is pending;

(4) public interest favors enjoining the destruction of the Wynterbrook residences, and thus preserving a remedy for Plaintiff, until a ruling on Plaintiffs' appeal can be had; and

(5) there exist present controversies regarding Atlanta's prior acquisition and destruction of residences in College Park that are ripe for declaratory judgment, most notably, whether the City can raze Wynterbrook as it is currently planning to do.

Weighing the likelihood of success, potential prejudice to Plaintiffs, lack of prejudice to Defendants, and the public interest in preserving the Wynterbrook residences, the equities strongly favor restoration of the injunction prohibiting the destruction of the Wynterbrook residences until Plaintiff's appeal is decided.

## II.   STATEMENT OF FACTS

This is an action for violation of the Voting Rights Act. Defendants' acquisition of College Park property for both the expansion of the Hartsfield-Jackson Atlanta International Airport ("Atlanta Airport") and for their Part 150[1] noise abatement program has displaced voters and disrupted the political processes within the City of College Park for decades. The Part 150 Program is particularly

---

[1] The Aviation Safety and Noise Abatement Act of 1979 ("ASNA"), 49 U.S.C. § 47501 et seq. was enacted to reduce incompatible land uses in the vicinity of airports caused by aircraft noise. In 1981, the Federal Aviation Administration ("FAA") established the Noise Compatibility Planning Process as a part of the Federal Aviation Regulations to implement ASNA, listed as Part 150 of Title 14 of the Code of Federal Regulations.

destructive to College Park for two reasons. First, although Defendants have the discretion to limit the Program to sound mitigation, they insist upon including the option to acquire and demolish properties in certain areas of College Park that are inhabited predominately by African-Americans. Second, because Defendants accept federal grants for these acquisitions, they are precluded from using the acquired properties for residential purposes. As a result, once Defendants acquire property in College Park, they clear the land, remove the voters and residents, and leave the land undeveloped and uninhabited.

Since the 1960s, the portion of College Park owned by Defendants has steadily increased as follows:

| | |
|---|---|
| 1960s | 7% |
| 1970s | 17% |
| 1980s | 27% |
| 1990s | 32% |
| currently | 36% |

As a result, College Park's population has decreased from a high of 24,623 in the 1980s to only 19,270 in 2007. In fact, according to a recent population study performed by the Atlanta Regional Commission, between 2000 and 2007, the population of College Park decreased by 5.5%. Over this same time period, the number of registered voters in College Park districts within Fulton County has also decreased from a high of 9,739 in 1984 to only 6,733 in 2008. Further, because of these changes in College Park's population and electorate, the City Council of

College Park, which once consisted of six members elected from six wards, now consists of only four members elected from four wards.  The Defendants' actions, past and proposed, have had and would continue to have a major impact on the voters of College Park, the constituencies of each of its wards, and the City itself.

For the first forty years of Defendants' acquisition of land within College Park under the Part 150 Program, they acquired only single family homes.  Within the last two years, however, Defendants have accelerated the pace of property acquisitions in College Park by acquiring multi-family dwellings as well.  To that end, Defendants recently amended their NCP to include the acquisition of multi-family dwellings that may be affected by aircraft noise.

On April 18, 2008, Defendants closed on their acquisition of a multi-family dwelling in College Park, the Wynterbrook Apartments complex.  Upon information and belief, in anticipation of their recent acquisition of this property, Defendants entered into an understanding with the owner of Wynterbrook not to renew leases or to properly maintain the property.  Residents began moving out, so that by time Defendants actually purchased Wynterbrook, only twenty of the complex's 300 units were still occupied.  As a result, hundreds of residents who lived at Wynterbrook, all African-American, were displaced from College Park's Ward 4, thus eliminating many minority voters.  That one acquisition alone significantly decreased the voter population of College Park.

In addition to Wynterbrook, Defendants plan in their current NCP to acquire several other multi-family apartment complexes in College Park, including several that are adjacent to Wynterbrook along a street known as "Frontage Road."[2] Every single resident of these complexes moved in after the Atlanta Airport was in operation and with full knowledge of the noise issues. None of these residents have contacted College Park with airport noise complaints or to request that College Park find alternative housing for them to allow them to escape over flights.

If Defendants are permitted to acquire and demolish these apartment complexes – thereby displacing hundreds of additional College Park minority voters – the voter population of College Park's Ward 4, which currently is comprised of slightly more than 4900 residents, will be reduced by approximately 3000 residents, almost all of whom are African-American. These 3000 residents

---

[2] Atlanta Airport's FAR Part 150 Study, Noise Compatibility Program Report, Volume II, dated September 5, 2007, Section 6.3, titled "Estimated Property Acquisition Costs," provides in relevant part as follows:

> A review of the existing land use indicates that approximately 876 residential structures are located within the 70-74 DNL of the 2007 NEM. Of these residences, it is estimated that three are single-family and 873 are multi-family units in seven apartment complexes. ***All of these units are located within the City of College Park***. The current DOA administration recognizes them as being noise sensitive and as a mitigation measure proposes to acquire eligible multi-family structures and complexes located between the 70-74 DNL contours.

(emphasis added).

comprise approximately 15% of the entire population of College Park and nearly two-thirds of Ward 4.

### III. ARGUMENT AND CITATION TO AUTHORITY

Pursuant to Federal Rule of Civil Procedure 62(c), while an appeal of a final judgment that dissolves an injunction is pending, the district court may "suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." FED. R. CIV. P. 62(c). "A party seeking a restoration of an injunction pending appeal must show (1) that he will likely prevail on the merits of the appeal, (2) that he will suffer irreparable injury if the restoration is denied, (3) that other parties will not be harmed by the restoration, and (4) that the public interest will be served by granting the restoration." Peck v. Upshur County Bd. of Educ., 941 F. Supp. 2d 1478, 1481 (N.D.W.Va. 1996) (citing Long v. Robinson, 432 F.2d 977, 979 (4th Cir. 1970)); accord Parker v. State Bd. of Pardons and Paroles, 275 F.3d 1032, 1034-35 (11th Cir. 2001) ("A TRO or preliminary injunction is appropriate where the movant demonstrates that: (a) there is a substantial likelihood of success on the merits; (b) the TRO or preliminary injunction is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant; and (d) the TRO or preliminary injunction would not be adverse to the public interest.").

The decision to grant or deny injunctive relief is within the sound discretion of the trial court. See Cafe 207, Inc. v. St. Johns County, 989 F.2d 1136, 1137 (11th Cir. 1993). However, a district court "must exercise its discretion in light of the four prerequisites." Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994).

### A. Likelihood of Success on the Merits

The likelihood-of-success prong of the restoration test does not mean that the trial court needs to change its mind or develop serious doubts concerning the correctness of its decision in order to restore an injunction pending appeal. See Peck, 941 F. Supp. 2d at 1481. Where, as here, the remaining three prongs of the restoration test weigh heavily in favor of restoring the injunction, the district court may exercise its discretion to restore the injunction to preserve the status quo during the appeal process if the movant has put forth substantial, colorable arguments on the merits or if the issues raised present difficult or novel legal questions. See Peck, 941 F. Supp. 2d at 1481; Goldstein v. Miller, 488 F. Supp. 156, 174 (D.C.Md. 1980) ("[D]espite this Court's strong belief as to the correctness of its views as set forth in its February 29, 1980 opinion, there is little doubt that at least some of the issues raised in these cases present serious questions of first impression. For that reason, this Court concludes that plaintiffs have met the burden imposed by the first of the four standards applicable herein.").

In this case, Plaintiffs can satisfy the likelihood-of-success-prong of the restoration test because (1) the burden Plaintiffs must carry to show the necessity of certifying this case to a three-judge court is exceedingly low and (2) Plaintiffs have made colorable arguments on a novel question of law arising from the unique facts in this case.

Under 28 U.S.C. § 2284, a single judge may determine that three judges are not required only if a plaintiff's Section 5 challenge is "wholly insubstantial." League of United Latin Am. Citizens v. Texas, 113 F.3d 53, 55 (5th Cir. 1997) (quoting Goosby v. Osser, 409 U.S. 512, 518, 93 S. Ct. 854, 35 L. Ed. 2d 36 (1973)); 28 U.S.C. § 2284(b)(1).  The Supreme Court has made clear just how minimal a showing is required to establish the substantiality of such a claim:

> "[I]nsubstantiality" for this purpose has been equated with such concepts as "essentially fictitious," "wholly insubstantial," "obviously frivolous," and "obviously without merit."  The limiting words "wholly" and "obviously" have cogent legal significance.  In the context of the effect of prior decisions upon the substantiality of constitutional claims, those words import that claims are constitutionally insubstantial only if the prior decisions inescapably render the claims frivolous; previous decisions that merely render claims of doubtful or questionable merit do not render them insubstantial. ... **A claim is insubstantial only if its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy**.

Goosby, 409 U.S. at 518 (emphasis added).

The facts of this case are unique in that the City of Atlanta, a political sub-unit of Georgia that indisputably falls under the jurisdiction of Section 5, is actively displacing large numbers of minority voters outside of its boundaries in the separate political jurisdiction of College Park. As this Court observed in its March 31, 2009 Order, there appears to be no legal precedent addressing this unique situation under current Voting Rights Act jurisprudence. The Court expressed its reluctance to expand the scope of existing Section 5 case law to encompass this unique set of facts, but it did not point to a case clearly foreclosing the possibility that a city subject to Section 5 jurisdiction could be prohibited from displacing large numbers of minority voters both inside and outside of its immediate jurisdiction. The legal issue presented here is indisputably a novel question of law.

In <u>United States v. Bd. of Comm'rs of Sheffield, Ala.</u>, 435 U.S. 110, 118 (1978), the Supreme Court held that Section 5 applies "applies to entities having power over any aspect of the electoral process within designated jurisdictions." It is undisputed that the City of Atlanta has the power to displace large numbers of minority voters in College Park through the authority given to it by O.C.G.A. § 6-3-20 and the Aviation Safety and Noise Abatement Act and that by wielding that power "rapaciously," the City of Atlanta is diluting College Park's minority voting

pool.[3]  As a result of the City of Atlanta's power to eradicate residential areas in College Park (which College Park is seemingly powerless to stop), the minority residents in the fourth ward have had their political influence in College Park diminished.  Nowhere in Bd. of Comm'rs of Sheffield, Ala. does the Supreme Court address Section 5's applicability to a political entity's exercise of extraterritorial power because that factual scenario was not before the Court.  This Court's narrow interpretation of Bd. of Comm'rs of Sheffield, Ala. to limit Section 5 to entities with the power to redraw boundary lines or "to impose rules and regulations upon citizens of College Park" is inconsistent with the Supreme Court's mandate that Section 5 be given the "broadest possible scope."  Id. at 122-23.

In sum, Plaintiffs have proffered substantial and colorable arguments in support of their request for a three-judge court to determine the applicability of Section 5, and the unique facts at issue in this case raise serious questions about the scope of Section 5 that have not been clearly foreclosed by the Supreme Court or the Circuit Courts of Appeal.  Accordingly, Plaintiffs have satisfied the first element of the restoration test.

---

[3] It is axiomatic that the City of Atlanta could not engage in the wholesale displacement of minority voters within its own political boundaries without preclearance under Section 5, nor could College Park displace its citizens in the way Atlanta is displacing them.  It is simply not clear as a matter of law that the City of Atlanta's rare extraterritorial power to displace minority voters in other cities is not subject to the safeguards provided by Section 5.

## B.     Restoration of the Injunction Will Prevent Irreparable Injury to Plaintiffs

The irreparable harm to Plaintiffs if the Court does not restore the injunction pending the outcome of Plaintiffs' appeal is indisputable. If the City of Atlanta goes forward with the demolition of the Wynterbrook residences while Plaintiffs' appeal is pending, Plaintiffs would be robbed of any meaningful remedy should they prevail on appeal. Once the City of Atlanta destroys those residences, College Park will be unable to return the property to residential use. Moreover, the damage to College Park's minority community will be irrevocable, as many of the minority citizens who are being displaced are not resettling in College Park.

Also, if this Court does not restore the injunction, Plaintiffs will be denied their rights under 42 U.S.C. § 1973c(a), which is irreparable harm itself. "As to irreparable harm, it is well-settled that the claimed deprivation of a constitutional right such as the right to a meaningful vote or to the full and effective participation in the political process is in and of itself irreparable harm." Puerto Rican Legal Defense and Educ. Fund, Inc. v. City of New York, 769 F. Supp. 74, 79 (E.D.N.Y. 1991) (citing Reynolds v. Sims, 377 U.S. 533, 562, 565 (1964)).

Atlanta's destruction of Wynterbrook once done cannot be undone. The loss of the 300 residences at Wynterbrook will irreparably alter one of College Park's four wards, substantially diminish the minority voting population, and will impair minority voting opportunities in the fourth ward. Accordingly, this factor in the

restoration test weighs heavily in favor of restoring the injunction prohibiting Wynterbrook's destruction pending the outcome of Plaintiffs' appeal.

> **C.  Restoration of the Injunction Pending the Outcome of the Appeal Will Have Minimal Adverse Impact on the City**

The potential harm to College Park and its citizens from the destruction of the Wynterbrook residences far outweighs any harm to the City of Atlanta from the restoration of the injunction while Plaintiffs' appeal is pending.  As the City of Atlanta admitted during oral argument on April 21, 2008 and again recently, the City has no immediate plans to do anything with the property other than to tear it down.[4]  Atlanta's intention with regard to the Wynterbrook property appears to be simply to raze the residences to the ground and let the property lay dormant for an undetermined period of time.  (The City of College Park is already littered with vacant and overgrown lots as a result of Atlanta's "noise abatement" program.)  Thus, Atlanta will not suffer any significant injury if the injunction is restored pending the outcome of the appeal.[5]

---

[4] City of Atlanta attorney Robert Caput has confirmed by telephone that the City plans to destroy the Wynterbrook residences when it obtains the necessary permits, which it expects to obtain in or around June 2009.

[5] To the extent the City of Atlanta has to maintain the property until the appeal is decided, such harm is purely economic and can easily be addressed through a bond or an agreement with College Park regarding maintenance of the property.

### D. Restoration of the Injunction Would Not be Adverse to the Public Interest

There is no evidence to suggest that this Court's granting of Plaintiffs' Motion would harm the public interest. If anything, halting the demolition of Wynterbrook until the Court of Appeals can determine whether Plaintiffs have stated a valid claim under the Voting Rights Act would benefit the public interest, especially the 3,000 minority citizens who comprise much of College Park's fourth ward.

### E. Plaintiffs are Likely to Succeed on Appeal of the Court's Ruling That Plaintiffs' Declaratory Judgment Claim is Moot

Similarly, Plaintiffs are likely to succeed on the merits of its appeal of the District Court's finding that Plaintiffs' declaratory judgment claim is moot because the Court's ruling is founded solely on the uncertainty of prospective land acquisition by the City of Atlanta and does not address Plaintiffs' claims that the City's past acquisitions required preclearance under Section 5. Even if the Court is correct in ruling that the Plaintiffs' evidence regarding the City of Atlanta's anticipated future funding needs (which identifies 876 residences in College Park that the City anticipates acquiring) is too indefinite to create a controversy of such immediacy that the Court should convene a three-judge court, no such finding has been made with regard to the City's past acquisitions, including its most recent acquisition of the Wynterbrook apartments. As discussed in Plaintiffs'

Supplemental Brief and at oral argument, there is no statute of limitations on the City of Atlanta's violations of the Voting Rights Act, and Plaintiffs' are entitled to seek a declaration that the City's acquisitions dating back to 1964 are in violation of that Act.[6]

Moreover, there is an immediate controversy over whether the City of Atlanta must obtain preclearance for its plan to destroy the Wynterbrook residences. The urgency of this controversy, and the irreparable harm that will flow from the destruction of Wynterbrook, weighs heavily in favor of restoring the injunction during the pendency of Plaintiffs' appeal. The fact that the City has already purchased Wynterbrook does not render this controversy moot because the City is not required to destroy the 300 residences in Wynterbrook in order to comply with its noise abatement guidelines, but can instead simply soundproof the apartments.[7] Thus, a declaratory ruling from the three-judge court on the applicability of Section 5 is a necessary prerequisite to determine whether Atlanta can proceed with the demolition of Wynterbrook without violating the Voting

---

[6] For a discussion of Atlanta's continuing liability for past violations of Section 5, and the remedies available therefor, see Plaintiffs' Supplemental Brief at Section III.D.3-4.

[7] Under Part 150, a local airport operator such as Defendants may submit a NCP for FAA review, which may involve any of the following noise abatement procedures: (1) land acquisition or relocation; (2) easement acquisition; (2) zoning or other land use controls; and (4) soundproofing buildings or residences. It is within the operator's discretion which of the noise abatement procedures it includes in any NCP that it submits to the FAA for review.

Rights Act. Given the City's plan to destroy the apartments when it obtains the necessary permits in or around June of this year, there exists a clear and valid controversy sufficient to support Plaintiffs' claim for declaratory judgment.

## IV. CONCLUSION

As shown above, Plaintiffs have satisfied all four prongs of the restoration test and respectfully request that the Court exercise its discretion to preserve the status quo by restoring the injunction prohibiting the demolition of Wynterbrook residences until Plaintiffs' appeal has been decided.

This 30th day of April, 2009.

| | |
|---|---|
| **BALCH & BINGHAM LLP** <br> 30 Ivan Allen Jr. Blvd. N.W., Ste. 700 <br> Atlanta, GA 30308 <br> Telephone: (404) 261-6020 <br> Facsimile: (404) 261-3656 | /s/ Greg Michell <br> Michael J. Bowers <br> Georgia Bar No. 071650 <br> Greg Michell <br> Georgia Bar No. 504053 <br> Robert F. Glass <br> Georgia Bar No. 115504 |
| **FINCHER DENMARK & WILLIAMS, LLC** <br> 2262 Mount Zion Road <br> Jonesboro, Georgia 30236 <br> Telephone (770) 478-9950 <br> Facsimile (770) 471-9948 | /s/ Steven M. Fincher <br> Steven M. Fincher <br> Georgia Bar No. 260235 <br> Winston A. Denmark <br> Georgia Bar No. 211751 <br> L'Erin F. Barnes <br> Georgia Bar No. 141797 |
| **PARKS, CHESIN & WALBERT, P.C.** <br> 75 14th Street, 26th Floor <br> Atlanta, GA 30309 <br> Telephone: (404) 873-8000 <br> Facsimile: (404)873-8050 | /s/ David F. Walbert <br> David F. Walbert <br> Georgia Bar No. 730450 |

Attorneys for Plaintiffs

## CERTIFICATE OF COUNSEL REGARDING FONT SIZE

Counsel certifies that the foregoing has been prepared using Times New Roman font size 14 in accordance with Local Rules 5.1(B)(3) and 7.1(D).

This 30th day of April, 2009.

                                                s/ Greg Michell
                                                Greg Michell
                                                Georgia Bar No. 504053

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2009, I electronically filed the foregoing **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION TO RESTORE INJUNCTION PENDING APPEAL** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:

>Robert B. Caput
>Michael S. Fineman
>City of Atlanta, Department of Law
>Robert.Caput@atlanta-airport.com
>Michael.Fineman@atlanta-airport.com

>  s/ Greg Michell
>  Greg Michell
>  Georgia Bar No. 504053